UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X CIVIL ACTION NO.  09 CIV 5446 (SHS)
LILIAN CASTILLA,

                                   PLAINTIFF,

    - against -                                          AMENDED
                                                  VERIFIED COMPLAINT
CITY OF NEW YORK, NEW YORK CITY                    JURY DEMAND
DETECTIVE OSCAR SANDINO, TAX ID #919673
INDIVIDUALLY AND AS A DETECTIVE
OF NEW YORK CITY POLICE DEPARTMENT,
AND POLICE OFFICERS JOHN DOE OFFICERS 1-10

                                   DEFENDANTS.
------------------------------------------------------------ X

            Plaintiff, LILIAN CASTILLA, by her attorney, Law Office of Jose A. Muniz, and as for her complaint against Defendants NEW YORK CITY ("CITY"); DETECTIVE OSCAR SANDINO, ("Sandino") individually, and New York City Police Department; Police officers John Doe 1-10, (Collectively "Defendants"), does hereby state and allege:

## PRELIMINARY STATEMENT

1. Defendant, New York City Police Detective Oscar Sandino, sexually assaulted, battered, threatened and repeatedly intimidated plaintiff Lilian Castilla, including sodomizing plaintiff, in a New York City Police Department Precinct bathroom, on February 16, 2008, while Defendant Detective John Doe stood outside the bathroom on guard, and with the help and knowledge of other New York City Police Officers, Defendants' John Does.  These actions were in direct violation of plaintiff Lilian Castilla's federal constitutional and rights, guaranteed by the Equal Protection Clause of the 14th Amendment, the 5th Amendment Due Process Clause, and the 4th Amendment of the U.S. Constitution, and in violation of 42 U.S.C. Sections 1983 and 1985.

2. Defendant Sandino used his position and power as a Detective to isolate plaintiff for purposes of securing her assistance as a confidential informant and to gain sexual favors through intimidation, coercion and fear tactics. He wielded this power as a result of Defendant New York City Police Department's policy and practice which provides practically unimpeded control over female suspects and prospective female confidential informants, and which fails to explicitly prohibit the use of sexual dominance and gender exploitive control tactics that seek to further investigative ends and individual officer's personal prurient desires.

## JURISDICTION AND VENUE

3. Jurisdiction is founded upon the existence of a Federal Question, in accordance with 28 U.S.C. §1331, as well as 28 U.S.C. §1343(3) and (4), this being an action authorized by law to redress the deprivation under color of law, statute, ordinance, regulation, custom and usage of a right, privilege, and immunity secured to plaintiff by the Fourth, Fifth and Fourteenth Amendments to the Constitution of the United States, 42 U.S.C. §1983.

## PARTIES

4. Plaintiff LILIAN CASTILLA is a legal resident of the United States and a resident of the City of New York, County of Queens, and State of New York.

5. Upon information and belief, at all times hereinafter mentioned, the defendant THE CITY OF NEW YORK, was and still is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York.

6. Upon information and belief, at all times hereinafter mentioned, the defendant THE CITY OF NEW YORK, its agents, servants and employees operated,

maintained and controlled the Police Department of the City of New York, including all the police officers thereof.

7. Upon information and belief, at all times hereinafter mentioned, and on or prior to February 16, 2008, defendant OSCAR SANDINO was employed as a Detective by defendant, THE CITY OF NEW YORK.

8. Upon information and belief, at all times hereinafter mentioned, and on or about February 16, 2008, defendants John Doe Officers 1-10 were employed by defendant the CITY OF NEW YORK.

9. This action arises under the United States Constitution, particularly under provision of the Fourth, Fifth and Fourteen Amendments to the Constitution of the United States, and under federal law, particularly the Civil Rights Act, Title 42 of the United States Code, Sections 1983 and 1985 and the rights under the Constitution and laws of the State of New York.

10. Each and all of the acts of the defendants alleged herein were done by the defendants, their agents, servants and employees, and each of them, not as individuals, but under the color and pretense of the statutes, ordinances, regulations, customs and usages of the State of New York, and City of New York.

## **FACTS**

Background

11. This action arises from the shameful acts of defendant Oscar Sandino, a member of the Police Department of New York City, and fellow officers, and the conspiracy to cover it up, by other Detectives and Officers of the New York City Police Department.

12. Plaintiff seeks compensation for the unconstitutional and tortuous conduct of defendant Sandino, who sexually attacked plaintiff, Lilian Castilla, and other detectives and officers who witnessed or were aware of these events, yet failed to report what they knew, thereby creating a %blue wall+ of silence and lies to obstruct justice and prevent the truth from surfacing, and police supervisors who failed to control subordinates, with a history of sexually abusive behavior.  Ms. Castilla seeks redress against the Police Department of the City of New York for their policy and practice which provides practically unimpeded control over female suspects and prospective female confidential informants, and which fails to explicity prohibit the use of sexual dominance and gender exploitive control tactics that seek to further investigative ends and individual officers personal prurient desire of this policy and practice is the sexual attack upon plaintiff Lilian Castilla.

13. Upon information and belief, defendant Sandino had prior incidences of sexual abuse against females within his custody and control.

**The Initial Search at Plaintiff's Apartment and Strip Search**

14. On February 16, 2008, Defendant Sandino, and several other detectives and police officers, stormed into plaintiff's apartment with guns drawn and pointed at plaintiff and her mother and three children, to execute a search warrant.  Plaintiff was in her bathrobe and her children were in their pajamas when the police entered the apartment.

15. Plaintiff's boyfriend, Daniel Duverge, was questioned while plaintiff, her children and mother looked on.  When defendant Sandino directed plaintiff to get her children's clothing defendant Sandino followed her to her children's bedroom.

16. During the course of the search, defendant Sandino took plaintiff into a separate room, alone.  He radioed downstairs, stating "no female cop", looked at plaintiff, who was in her bathrobe, and told her to undress in front of him.  Defendant Sandino asked plaintiff: "Why are you doing this?" He said, "If I would see you in the street I would fucking eat you alive."

17. Plaintiff proceeded to undress in front of Sandino.  When she had disrobed to her underwear, defendant made her turn around and ordered her to remove her bra and give it to him.  Plaintiff complied, and covered her breasts with her other hand.  Sandino ordered her to turn around again. He checked her bra and her clothing.  As plaintiff started to get dressed, there was a knock on the door. It was a female officer. Defendant appeared surprised and said, "I thought there  were no female cops" and left the room. When the female officer and plaintiff were in alone in the room, Ms. Castilla asked her "what is going on?" She replied, "Sweetie I don't know they just told me to come upstairs."

18. Upon information and belief the female officer did not make a report regarding defendant Sandino's strip search of the plaintiff.

19. The female officer failed to inquire as to defendant Sandino being alone with plaintiff, a female suspect.

20. Sandino questioned plaintiff regarding her boyfriend, and his drug activities. Sandino threatened to take her children away.  If she did not cooperate with their investigation.

21. One and one half to two (1 ½-2) hours after the police entered the apartment, defendant Sandino ordered that plaintiff and her boyfriend be taken in separate cars to the Precinct.

22. Plaintiff was put in a burgundy or red colored SUV, in the back seat.  Defendant Sandino was driving, while another detective sat in the front seat on the passenger's side.

23. Rather than take the plaintiff directly to the Precinct, the officers drove her around and took her to a dead end street in Queens.

24. Defendant stated to plaintiff "you are so fucking calm"  you know you are going to lose your kids."

25. Plaintiff was terrified that something would be done to her or her children. Plaintiff started crying and told Sandino that "I didn't know what was going through my mind."

26. Defendant continued with his intimidation tactics by threatening her with injury to plaintiff's family pet cat.  He told plaintiff: "This is what we're going to do. We are going back to your apartment and look for your cat. I have dogs that are going

there and they will eat him up.+  This referred to the Police Department animal unit.

27. Defendant drove plaintiff back to her apartment building, and ordered the other detective to exit the vehicle.  The detective exited the vehicle without hesitation.

28. Upon information and belief the other detective, fully aware that he was leaving the plaintiff alone with detective Sandino, failed to report that Sandino was alone with plaintiff in the vehicle.  This other detective also failed to inquire of defendant Sandino about his interaction with the plaintiff during the time that they were alone in the vehicle.

29. Defendant turned to plaintiff and said: +what are willing to do for your kids?+  Plaintiff responded: %what do you mean anything?+

30. Defendant looked at plaintiff and stated the following, all in Spanish: %how did your children come into the worldõ  you had to be bedded.+

31. Defendant Sandino, prior to leaving plaintiff said to her: %you donq have to give me your answer now.+

**The Interrogation and Sexual Assault**

32. Defendant Sandino left and another two detectives entered the vehicle and took her to the 110th Precinct in Queens.

33. Plaintiff was left rear handcuffed, alone in a cell for approximately 1 ½ hours.  A detective, who was identified as John (John Doe 1), was left to guard her.  Plaintiff asked defendant John Doe 1 to make a telephone call.  He refused her request.

34. At Defendant Sandino's direction Plaintiff eventually was allowed to make a telephone call for the purpose of calling her brother to lock plaintiff's apartment. Plaintiff observed that John Doe 1 communicated with defendant Sandino continuously.

35. Defendant Sandino arrived at the 110th Precinct and removed the handcuffs from plaintiff, and took her to an interrogation room. Sandino, alone with the plaintiff, asked her: "what's your answer?" Plaintiff understood Sandino to be asking for her response to his demands for sexual favors in return for lenient treatment and her children not being taken from her.

36. Plaintiff remained silent because she feared that Sandino would act on his threats if she rejected his demands.

37. Defendant Sandino took out a large manila envelope and removed various documents and a bag with white power.  He then stated to her: "who the fuck deals with dollar bills?"

38. Another detective, Defendant John Doe 2 entered the room, who plaintiff described later to New York City Police Department Internal Affairs, as having a pudgy-nose and as being Sandino's partner.  Sandino told plaintiff, in this detective's presence, that they wanted her to be an    informant.  Plaintiff replied that    she might be able to point out persons who her boyfriend had spoken to, but knew nothing about his narcotic's business. Sandino ordered Plaintiff not to speak with anyone, especially her boyfriend.

39. Sandino's partner, Defendant John Doe 2, said to plaintiff:  "you're going to lose your kids".  Upon hearing this, plaintiff broke down and cried.

40. Defendant Sandino and Defendant John Doe 2 tried to recruit the plaintiff to be a confidential informant, but did not advise their superiors of their recruitment efforts.

41. Defendant John Doe 2 stated to plaintiff: "I don't know what deal you worked out with him," referring to Sandino.  Defendant John Doe 2 did not ask or press Sandino as to the arrangement that he was making to recruit the plaintiff as a confidential informant.  Instead, he left plaintiff alone in the interrogation room with Defendant Sandino.

42. Defendant Sandino, now alone with plaintiff, started sharing personal information, such as that he is married and has two (2) children, a son Jayden and daughter, Alexis.  Sandino compared his children to that of plaintiff, and how similar in ages they were.

43. Defendant Sandino then told her "if you agree, I will rip up the papers." Plaintiff understood Defendant Sandino to be referring to the Administration for Children Services (ACS), and that he would not contact them to remove plaintiff's children, in exchange for acquiescing to his demands for sex. Sandino then demanded "what is your answer?"

44. Plaintiff told Defendant Sandino, "I don't know, I am not that kind of girl." In an effort to placate him she further told Defendant Sandino that it would have been different if she knew him and things just happened naturally.

45. Defendant Sandino, stated "I like your taste of clothing" referring to the type of lingerie that plaintiff had in her apartment. Plaintiff observed Sandino, while in her bedroom, search through a Victoria Secrets bag, she received as a gift.

Defendant Sandino, then asked plaintiff what her favorite color was. Plaintiff answered yellow.

46. Defendant Sandino continued to engage in sexually charged conversation and stated "you look too pale in yellow, I like blue, I want to see you in that blue piece." Plaintiff, still frightened AND SHOCKED BY THE INTIMATE NATURE OF THE CONVERSATION AND THE CLOUD OF INTIMIDATION HANGING OVER HER, stated "you must do this to all the girls." Defendant shook his head no and said: "No, it's when I saw you, I just fucking wanted you."

47. Defendant Sandino again specifically threatened plaintiff to remain silent about his demands because if she talked he would not tolerate his kids be denied the life they deserve.  He further threatened her with physical violence when he told her that something would happen to her or her family if she told anyone about their conversation and his demands for sexual gratification because he had their addresses.

48. Defendant Sandino told plaintiff: "you don't need a lawyer.  This is what you are going to do." He proceeded to prompt her to commit lies in order to escape prosecution.  He took a two ($2.00) bill and a twenty $20.00 dollar bill from plaintiff's wallet, gave it to her and told her, in sum and substance: when you get out of Central Booking, take a cab. He told plaintiff to tell the Judge at arraignment that she lived at 55-14 69th Lane, Maspeth, New York, which is her brother's address, and not to use her Queen's  address. That she was to further mislead the arraigning Court, by telling it that she was visiting at her boyfriend's

apartment on the night of the raid. Plaintiff was further directed, by Sandino to tell the state court that she didn't know that her boyfriend was involved in narcotics.

49. Plaintiff sought defendant Sandino's permission to go to the bathroom. Defendant Sandino allowed her to go and accompanied her there. As he took her to the bathroom, Defendant Sandino handcuffed her again.

50. As they approached the bathroom, Sandino told Defendant John Doe 1 to stay with plaintiff, while he checked the bathroom. As Sandino entered the bathroom, Defendant John Doe 1 told him to be careful because the window was open.

51. Defendant Sandino came out of the bathroom and signaled to the plaintiff to enter.

52. Plaintiff entered one of the stalls and locked the door. Defendant Sandino went into the bathroom and ordered her not to lock the stall door. As the plaintiff began to exit, Sandino ordered her to stay in the stall and blocked her from exiting. Defendant crossed his right leg over his left and prominently displayed a gun strapped to his right leg. He then said "what is your answer?"

53. Plaintiff, fearful and feeling helpless, responded: "No, not here." Sandino told her "this is the safest place, no one can hear us." He ordered her to pull down her pants. Plaintiff feared that Sandino would rape her and thought immediately about her children's safety. She remained silent, even when Defendant Sandino sought to provoke her when he exclaimed provocatively, "wow you have an earring down there," and then grabbed it.

54. Defendant turned around, with his back to plaintiff. After a moment he turned around, faced her again, penis exposed and erect. Plaintiff felt trapped.

Defendant Sandino proceeded to sexually molest her. He touched her vagina, and fondled her breasts and other parts of her body. He then proceeded to sodomize her.

55. After Defendant Sandino finished he stated: "Now I know I can trust you!" He then pulled himself together and allowed her to exit the bathroom.

56. As plaintiff exited she saw Defendant John Doe 1 in the immediate vicinity of the bathroom.

57. Defendant John Doe 1, failed or refused to inquire as to what defendant Sandino was doing in the bathroom with plaintiff and why detective Sandino was taking a female suspect into the bathroom without getting a female officer to accompany the plaintiff.

58. Neither defendant Sandino nor Defendant John Doe 1 notified the Desk Sergeant or any commanding officers on duty, prior to defendant Sandino taking plaintiff into the bathroom.

59. At no time, did any of the defendant detectives or individual officers involved in the original arrest and interrogation make inquiries or reports about detective Sandino's actions, including his isolation of the plaintiff and his time alone with her in the interrogation room and the bathroom.

60. The Queens District Attorney's office never initiated or lodged criminal charges against the plaintiff.

**Defendant Sandino's Telephone Calls and Text Messages**

61. Detective Sandino engaged in a course of conduct of isolation and domination of the plaintiff, threatening her with the loss of her children and demanding sexual favors, in order to get her to be a confidential informant.

62. Defendant Sandino gave plaintiff his personal cell number, by putting it on her phone.

63. Defendant Sandino told plaintiff that she had until Tuesday, February 19, 2008, to contact him. Sandino expected to have sexual intercourse with the plaintiff. He further told her that if he did not hear from her he would submit the paper work to the Administration for Children Services, and have her children removed from her custody.

64. The following Tuesday, February 19, 2008, defendant Sandino called plaintiff; she did not answer the call. Later in the day, Sandino called plaintiff, again. Plaintiff, fearful, answered the phone. Defendant Sandino inquired as to where she was and where they could meet. He further directed her to call him back later and let him know.

65. Plaintiff, for her own safety, recorded numerous telephone phone calls and texts from Defendant Sandino.

66. Plaintiff recorded cell phone calls made by Defendant Sandino, from on or about February 23, 2008 through March 5, 2008.

67. Defendant Sandino made phone calls urging the plaintiff to get together with him; stating he would help her keep her children.

68. Several of the recorded calls refer specifically to the sexual attack in the bathroom.

69. Defendant Sandino continued to contact plaintiff, sending her text messages, leaving her voice messages, demanding to see her, and in one text of March 3, 2008 he indicated his frustration with her failure to take his calls and wrote, "I thought we had a deal inside the bathroom."

70. Plaintiff, subsequently, had a telephone discussion with her cousin, Elaine Baldeon and later met her at the home of Martha Rodriguez, Daniel Duverge's aunt.

71. Plaintiff told her cousin about the numerous telephone calls from Sandino she had received since being released from custody.  However, because she was frightened of defendant Sandino and concerned about the shame associated with being a sexual assault victim, she did not tell her cousin about the sexual attack.

72. Her cousin called the defense attorney representing Mr. Duverge and told him about Sandino's calls to plaintiff.  Plaintiff was afraid that Sandino would retaliate because she had told someone about the calls, but hoped that the attorney would be able to make the calls and the intimidation would stop.

73. The defense attorney called Defendant Sandino, and informed him that he was not to speak to the plaintiff.

74. Even after receiving a call from the defense attorney, defendant Sandino continued to call plaintiff.  Plaintiff ignored these contacts and did not return any of the calls.

75. Unable to reach or speak with plaintiff directly, defendant Sandino resorted to enlisting her family in his intimidation and coercive tactics. He called plaintiff's brother, Jose Castilla and directed him to call plaintiff, and tell her that Sandino wanted her to call him, and that if she did not call Sandino, Sandino would make sure that ACS removed her children from her custody.

76. Sandino had maintained contact with plaintiff's brother in an effort to continue his contact with plaintiff. His contact with plaintiff's brother sought to cast defendant Sandino as helpful.

77. Her brother told her that he thought defendant Sandino was trying to help her and their family.

78. When her brother called she told him she would not call defendant Sandino. Her brother yelled at her and stopped speaking to her because she had not done what defendant Sandino told her to do.

**The ACS Visits and Interviews**

79. On February 19, 2008, Yvonne McBride, a caseworker from ACS called plaintiff and scheduled an interview for later the same day.

80. They met at plaintiff's parents' home. While plaintiff's mother was being interviewed, defendant Sandino and defendant John Doe 1 entered the apartment. Defendant Sandino took plaintiff to another room and asked why she involved a lawyer? Why did she provide the lawyer with his telephone number? Sandino's partner said "you don't want to do that."

81. Defendant Sandino then returned to the room where McBride was interviewing plaintiff's mother. Plaintiff overheard McBride tell Sandino that plaintiff's case was

not prosecuted; that she was released directly from Central Booking without seeing a Judge.  Defendant Sandino advised Ms. McBride, that it was his case, and he could reopen it, if necessary.  He further stated that his investigation of plaintiff was ongoing.

82. Defendant Sandino sent John Doe 1 to escort McBride out of the apartment nd to her car.

83. Defendant Sandino took plaintiff into another room, away from plaintiffs mother, and told her that he would help her keep custody of the children.  Sandino, while alone in the apartment with plaintiff, asked her again why she did this, referring to getting a lawyer involved.  Plaintiff stated, she got nervous and didnt know what to do.

84. Defendant Sandino stated to her "what did I tell you?" Sandino continued berating plaintiff and stated, in sum and substance: she was not supposed to tell anyone what happened or discuss anything about him.

85. Defendant Sandino, in order to further intimidate the plaintiff, took out a legal pad that contained personal information about the plaintiff.  He read the following to her: that she was Colombian; had a white dog; was a blond, weight 140 pounds.

86. Sandino then said to her "I am here to help you" and in Spanish said to her that "I am not here to do you harm".  Defendant Sandino received a call from his partner and told him he would be right down. Defendant Sandino said to plaintiff "we need to speak."  She understood this to mean that he expected her to have sex with him.

87. Plaintiff had a follow-up appointment with ACS worker McBride, for drug testing. Defendant Sandino knew about this appointment, called plaintiff and told her, "when you are done call me."

**The Internal Affairs Bureau Complaint and Investigation**

88. On or about March 7, 2008, plaintiff met with Detectives from the Internal Affairs Bureau of the New York City Police Department. She provided them with copies of the audio and text messages.

89. On or about March 11, 2008, plaintiff was wired for recording. A meeting was set between plaintiff and Defendant Sandino, at the Buccaneer Diner in Astoria for approximately 7:00 p.m. Defendant Sandino met plaintiff at the diner.

90. The defendant was very suspicious, to the point where he threatened plaintiff and told her "if you are wired, I will pour water on you."

91. Plaintiff was so frightened that Defendant Sandino would harm her, that the IAB officials whisked her away from the meeting.

92. Defendant Sandino and the other officers have not been prosecuted and continue to be employed by Defendant New York City Police Department.

93. Defendant Sandino maintains his position as a New York City Police Detective.

94. No criminal charges of any type have been brought against Defendant Sandino, as a result of his actions and his criminal behavior against the plaintiff.

95. Upon information and belief, Defendant Sandino and other detectives and officers have provided false information to the District Attorney's Office and have obstructed justice in the investigation of the allegations made by the plaintiff.

96. Defendant Sandino and defendants John Does 1-10 acting individually, and jointly, agreed and conspired to obstruct justice and to conceal and cover-up the facts relating to defendant Sandino's sexual assault of plaintiff.

97. Defendant Sandino, acting individually, and jointly with defendants John Does 1-10 agreed and conspired to obstruct justice and conceal and cover-up, their criminal actions, in the sexual assault of plaintiff.

98. Defendant Sandino acting individually, and jointly with defendants John Does 1-10 agreed and conspired to obstruct justice and conceal and cover-up the New York City Police Department Internal Affairs' finding on the sexual assault by Defendant Sandino against Ms. Castilla, and in their dereliction of their duties as law enforcement officers.

99. Defendant Sandino individually, and jointly with defendants John Does 1-10 agreed and conspired to conceal and cover-up the facts related to defendant Sandino's sexual assault against Ms. Castilla in a deliberate act to deny plaintiff access to the Courts.

**Sexual Abuse by the NYPD**

100. Defendant NYPD has been on notice of a significant and pervasive problem of police officers' use of their position and power to abuse female suspects, prospective confidential informants, and confidential informants.

101. Upon information and belief officers use their position and power to intimidate and coerce females to submit to their demands for sexual gratification and to provide information for purposes of their law enforcement ends.

102. Upon information and belief Defendant NYPD has failed to address this problem within its rank and file by ignoring complaints of victims and testimony of victim's representatives and advocates and police conduct experts.

103. Upon information and belief Defendant NYPD's policies and practices exceed the bounds of administrative and law enforcement protocols because in addition to failing to address this misconduct and misuse of official power, it has continued to pursue policies and practices which provide for unlimited and unfettered discretion by police officers in their treatment of prospective female confidential informants.

104. The discretion accorded individual officers knows no bounds.  Upon information and believe it is neither specifically prohibited or discussed in the police manual, which is the guide back for the rank and file.

105. For example, there are several criminal cases in which NYPD officers have been charged with sexually abusing females within their custody or control.  Recently, two officers were indicted and charged with rape of a female they were escorting to her apartment,   Gender, Allison, Martinez, Jose and Goldiner, Dave. *NYPD Cops Charged in Rape of Drunken Woman They Escorted Home*, NY Daily News, April 29, 2009.

106. In 2005, two NYPD officers were charged with a sexual assault of a Latina after a routine traffic stop.  Subsequent to this assault coming to light, two other women came forward with complaints of sexual misconduct by these same officers. Baker, Al, *More Women Come Forward To Accuse Officers of Sexual Assault*, NY Times, Dec. 8, 2005; .  Baker, Al, *Woman Says Officers Sexually Abused*

*Her*, NY Times, Nov. 21, 2005; Baker, Al, *Accused of Abusing the Badge*, NY Times, Dec. 15, 2005.

107. The frequency and pervasiveness of traffic stops leading to sexual abuse has been labeled %Driving While Female+. Walker, Samuel and Irlbeck, Dawn, %Driving While Female: A National Problem in Police Misconduct,+ May 2002.

108. Such conduct was also the basis of litigation and a consent decree by the New York State Attorney General involving officers in Wallkill, New York.

109. In 1998, NYPD officer was convicted of sexually abusing a female at the precinct where she was taken after a domestic incident. *Roane, Kit, Officer is Convicted of Sexually Abusing Woman in Police Station*, NY Times June 27, 1998.

110. The United National Committee on the Elimination of Racial Discrimination stated in its December 2007 report reviewing the United States of America Second and Third Periodic Report to the Committee on the Elimination of Racial Discrimination, cited two studies by the Sex Workersq Project of the Urban Justice Center in New York City, which found that %up to 17% of sex workers interviewed reported rape, sexual harassment and abuse by law enforcement officers.+ UN Report, *In the Shadows of the War on Terror*, p. 28.

111. 106. It was the policy and/or custom of the City to investigate inadequately and improperly civilian complaints of police misconduct. Instead, acts of brutality were tolerated by the City. The Internal Affairs Bureau (IAB) has substantially failed to investigate, deliberate and discipline transgresses. IAB investigations of brutality and assault rarely lead to administrative trials and when they do, and the charges are somehow sustained, the punishment is minimal, lacking any

deterrent effect.  Since there is no disciplinary sanction available between thirty

days suspension and dismissal, and dismissal is almost always deemed too

harsh, even the most brazen acts of brutality, short of murder, are resolved with a

slap on the wrist. The City has been on notice for more than a generation that

brutality is widespread and that particular reforms need to be implemented.

From reform-minded Commissioner Patrick Murphy to the Mollen Commission

twenty-five years later, the City has been repeatedly cautioned that a systemic

tolerance for brutality flourishes throughout the NYCPD.  The Mollen Commission

report noted, "This tolerance, or willful blindness, extends to supervisors as well".

Mollen Comm. Report, at 49.

### COUNT I

### DEPRIVATION OF CIVIL RIGHT TO PERSONAL SECURITY AGAINST DEFENDANTS SANDINO, AND THE CITY OF NEW YORK

112. Plaintiff repeats and realleges allegations contained in paragraphs 1-111 of this

complaint as if fully set forth herein.

113. Defendant Sandino used his position as a narcotics detective to intimidate and

put plaintiff, an arrestee and suspect in a narcotics investigation, in a vulnerable

position, within his sole control, in order to recruit plaintiff as a confidential

informant. He used his position as a police detective to gain the plaintiff's

submission and to instill fear, by the use of isolation tactics, threats of the

removal of her children by the City and through violent sexual dominance,

including a strip search, foundling of the plaintiff in her home, and sexually

attacking her in the precinct bathroom.

114. Defendant Sandino, under color of law, used malicious wanton and unwarranted force on Lilian Castilla causing physical and emotional injuries. This abuse of power and use of force constitutes a constitutional tort by Defendants Sandino, and City of New York which deprived Lilian Castilla of her constitutionally guaranteed and protected rights to personal security, to be free from unlawful seizure and from unlawful force, in violation of the Fourth, Fifth and Fourteenth amendments to the Constitution of the United States and 42 U.S.C § 1983.

115. As a direct and proximate cause of defendant's actions, plaintiff has suffered substantial damages, including severe emotional distress

## COUNT II

### VIOLATION OF PLAINTIFF'S CIVIL RIGHTS
### UNDER 1983 FOR THE SEXUAL ASSAULT AGAINST PLAINTIFF
### BY DEFENDANT DETECTIVE SANDINO

116. Plaintiff repeats and realleges allegations contained in paragraphs 1-115 of this complaint as if fully set forth herein.

117. In engaging in the conduct described, by sexually assaulting and battering, and falsely imprisoning plaintiff, defendant Detective Sandino, deprived plaintiff of her Civil Rights pursuant to 42 U.S.C § 1983. Further, as Detective employed by Defendants City of New York and the New York Police Department, defendant Sandino was acting under the color of the State law. That the aforementioned misuse of authority and power by defendant was egregious and shocking to the conscience. As a direct result, plaintiff was caused to undergo the humiliation and indignities resulting from being compelled to engage in the physical contact and unlawful confinement described, against her will, including a strip search;

and was caused, and will continue to undergo and endure, severe mental anguish, humiliation and economic hardship as a consequence thereof. Such deprivations were in violation of the rights secured to plaintiff by the Fourth and Fourteenth Amendments of the United States Constitution and by Title 42 U.S.C § 1983.

## COUNT III

## CONSPIRACY TO OBSTRUCT JUSTICE
## AGAINST ALL DEFENDANTS

118. Repeats and realleges allegations contained in paragraphs 1-117 of this complaint as if fully set forth herein.

119. The Defendants, under color of law, conspired for the purpose of impeding, hindering, obstructing and defeating the due course of justice in the criminal courts and the civil courts of the State of New York relating to defendant Sandino's violent sexual assault, with intent to deny Plaintiff, Lilian Castilla, due process and the equal protection of the laws and with invidious discriminatory animus toward her as a young woman in violation of the Fourth, Fifth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1985 (2).

120. As a direct and proximate cause of defendants' actions, plaintiff has suffered substantial damages, including severe emotional distress

## COUNT IV

### DEPRIVATION OF CIVIL RIGHTS TO DUE PROCESS
### AND EQUAL PROTECTION OF LAW
### AGAINST ALL DEFENDANTS

121. Repeats and realleges the allegations contained in paragraphs 1-120 of this complaint as if fully set forth herein.

122. Acting under color of law, Defendants' malicious and deliberate cover up and conspiracy deprived Lilian Castilla of her right to due process and equal protection of the laws, in violation of the Fourth, Fifth and Fourteenth Amendments to the Constitution of the United States and 42 U.S.C § 1983.

123. As a direct and proximate cause of defendants' actions, plaintiff has suffered substantial damages, including severe emotional distress.

## COUNT V

### 42 U.S.C. § 1983 – MONELL CLAIM

124. Repeats and realleges the allegations contained in paragraphs 1-123 of this complaint as if fully set forth herein.

125. Prior to February 16, 2008, the City developed and maintained policies and customs exhibiting deliberate indifference to the constitutional rights of its citizens, which caused the violations of plaintiff, Lilian Castilla, rights.

126. It was the policy and/or custom to supervise and discipline officers  inadequately, including defendant Sandino, thereby failing to discourage Constitutional violations on the part of its police officers.

127. Police officers of the City of New York have for years engaged in a pattern and practice of actively and passively covering up the misconduct of fellow officers by failing to come forward or failing to accurately give evidence as to misconduct of which they are aware, thereby establishing and perpetuating a "code of silence."

128. This "code of silence" is a custom deeply ingrained in the members of the New York City Police Department so as to constitute the actual policy of the City of New York.

129. The City has been deliberately indifferent to the need for more or different training, rules and regulations relating to police officers who witness or have information regarding misconduct by fellow officers.  The City has failed to properly sanction or discipline officers who are aware of and subsequently conceal and/or aid and abet violations of constitutional rights of citizens by other New York City police officers, thereby causing and encouraging New York City police officers, including the individual defendant officers in this case, to violate the rights of citizens such as Lilian Castilla.

130. It is believed the City has maintained no system or an inadequate system of review of officers who withhold knowledge or give false information regarding misconduct by fellow officers.  This failure to identify and track such officers, including the defendant officers, or to discipline, more closely supervise, or retain such officers who engage in the "code of silence," causes New York City police officers to believe that they can engage in misconduct, secure in the

knowledge that their fellow officers will neither intervene, nor give evidence against them.  These systemic deficiencies include, but are not limited to:

a) Preparation of investigative reports designed to vindicate the conduct of officers who gave false information about the misconduct of other officers, or who falsely denied knowledge about misconduct which they were in a position to observe;

b) Preparation of investigative reports which uncritically rely solely on the word of police officers and which systematically fail to credit testimony of non-police witnesses;

c) Preparation of investigative reports which omit or ignore factual information and physical evidence which contradict the accounts of police officers;

d) Issuance of public statements exonerating officers involved in such incidents prior to the completion of investigation;

e) Failure to have meaningful review of investigative reports by responsible superior officers for accuracy or completeness, including consideration of the conduct of officers who were not actively engaged in the misconduct which was the subject of the investigation, and acceptance of conclusions which are not supported by the evidence or which contradict such evidence; and,

f)  Failure to identify potential "code of silence" violations and maintain accurate records of allegations of such misconduct.

g) Issuance of false or misleading statements to the press to impugned the credibility and charades of abused citizens.

131.  The City, prior to and at the time of this incident, was aware of the need for more or different training, rules, regulations, investigation and discipline relating to police officers who practice the "code of silence," and was deliberately indifferent to that need.

132.  The foregoing acts, omissions, systemic deficiencies and deliberate indifference to the danger of harm to citizens like plaintiff and the need for more or different training and discipline are policies, practices and customs of the City of New York and have caused police officers, including the officer defendants in this case, to believe that they can violate the rights of citizens with impunity, and that their fellow officers would conceal such conduct, including swearing falsely and committing perjury, all with the foreseeable result that officers are more likely to violate the constitutional rights of citizens

133.  As a direct and proximate result of the City's deliberate indifference, defendants violated the plaintiff's constitutional rights for which she suffered substantial damages, including severe emotional distress.

## COUNT VI

## 42 U.S.C. § 1983 – MONELL CLAIM

134.  Repeats and realleges the allegations contained in paragraphs 1-133 of this complaint as if fully set forth herein.

135.  The New York City Police Department has a policy and practice that provides individual officers and detectives working on narcotics and vice cases with unfettered discretion to exercise sexual dominance and control over female

suspects and prospective confidential informants, in order to further law enforcement goals.

136.    In the present case, detective Sandino used his position as the lead investigator detective to isolate plaintiff, in order to dominate and control the plaintiff, after her arrest on February 16, 2008.  He used his position to demand sexual favors and information to assist in his investigation of the drug case, in exchange for leniency and keeping the children from being taken from plaintiff's custody.

137.    Defendant Sandino's attempts to secure plaintiff as a confidential informant were furthered through sexually abusive conduct, harassment, intimidation, and sodomy.

138.    As a direct and proximate result of the City's policies and practice of providing unfettered and unchecked discretion in its officers to secure the cooperation of confidential informants defendant NYPD violated the plaintiff's constitutional rights for which she suffered substantial damages, including severe emotional distress.

**WHEREFORE,** plaintiff requests the following relief jointly and severally as against all of the defendants:

1.    Award compensatory damages in an amount to be determined at trial;

2.    Award damages for pain and suffering in an amount to be determined at trial;

3.    Award punitive damages in an amount to be determined at trial;

4.    Declare defendants' actions have violated plaintiff's constitutional and civil rights, including her rights guaranteed under the Fourth, Fifth and Fourteenth Amends to the US Constitution;

5.  Enjoin defendants from taking any further actions in violation of plaintiff's rights;

6.  Enjoin defendant NYPD from continuing its policy and practice as related to the recruitment, and use of female confidential informants by officers which provides unfettered and unsupervised discretion to such officers resulting in the officers use of sexually abusive tactics to dominate and control prospective and existing female confidential informants;

7.  Disbursements, costs, and attorneys' fees; and

8.  For such other and further relief as this Court may deem just and proper.

PLAINTIFF DEMANDS TRIAL BY JURY

Dated:  New York, New York
         December 16, 2009

_____
THE LAW OFFICE OF JOSE A. MUÑIZ, P.C.
BY: JOSE A. MUÑIZ, ESQ. (JM 3101)
Attorney for Lilian Castilla
277 BROADWAY, SUITE 108
NEW YORK, NEW YORK, 10007

<u>VERIFICATION</u>

Lilian Castilla, being duly sworn deposes and says:

I am the plaintiff herein and have read the foregoing AMENDED VERIFIED COMPLAINT, and know the contents to be true to my own knowledge except as to those matters therein stated to upon information and belief, and that, as to those matters, I believe them to be true.

DATED:  NEW YORK, NEW YORK
            December 16, 2009

_____
LILIAN CASTILLA

Sworn to before me this
16th day of December 2009.

_____
          NOTARY